UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**KAREN RENEE SALAZAR**,  Case No. 3:15-CV-01294-KI

         Plaintiff,  OPINION AND ORDER

   v.

**CAROLYN W. COLVIN, Acting Commissioner of Social Security**,

         Defendant.

   Karen Renee Salazar
   13325 SE Lee Ave.
   Milwaukie, OR 97267-1139

      *Pro se* Plaintiff

   Billy J. Williams
   United States Attorney
   District of Oregon
   Janice E. Hebert
   Assistant United States Attorney
   1000 SW Third Ave., Ste. 600
   Portland, OR 97204-2902

Page 1 - OPINION AND ORDER

Jordan D. Goddard
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

    Attorneys for Defendant

KING, Judge:

*Pro se* plaintiff Karen Salazar brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). I affirm the decision of the Commissioner.

## BACKGROUND

Salazar protectively filed an application for DIB on October 10, 2005. The application was denied initially and upon reconsideration. After a hearing, the ALJ issued a decision on March 4, 2009 finding Salazar not disabled within the meaning of the Act. Salazar's nurse practitioner, Kevin Probst, completed a Clinician's Report of Work Ability on May 4, 2009, which was submitted to the Appeals Council. The Appeals Council declined to review the decision of the ALJ.

Upon appeal, the District Court for the District of Oregon reversed and remanded for further proceedings. It concluded that the ALJ had given "specific and legitimate reasons" to accept the findings of consulting physician John Ellison, M.D., over the initial opinion of NP Probst. *Salazar v. Astrue*, 859 F. Supp. 2d 1202, 1224 (D. Or. 2012). However, it concluded that Salazar had demonstrated a "reasonable possibility" that NP Probst's May 4, 2009 opinion

Page 2 - OPINION AND ORDER

would have changed the outcome of the administrative proceeding. *Id.* at 1225. NP Probst's opinion was that Salazar's rheumatoid arthritis "makes it very difficult for her to use her small joints (hands) for any significant period of time. Even sedentary work such as keyboarding or other activities grasping would be quite difficult." AR. 275. The court questioned the ALJ's reliance on the consultants' reports, including Dr. Ellison's, all of whom concluded there was no objective evidence supporting Salazar's diagnosis of rheumatoid arthritis. *Salazar*, 859 F. Supp. 2d at 1227, 1228. Additionally, the court questioned the ALJ's reasons for rejecting Salazar's testimony about the extent of her pain and the side effects of her medications, and pointed out Salazar's 18-year work history substantiated her complaints of pain.

While pending on appeal, Salazar filed subsequent applications for DIB and SSI. Upon remand, the Appeals Council deemed these applications duplicative. In connection with these applications, Salazar returned to Dr. Ellison for a subsequent evaluation on May 7, 2011. The Cooperative Disability Investigation Unit (CDIU) conducted an investigation of Salazar's reports of disability in August 2011.

Upon remand, Salazar appeared and testified before a different ALJ on November 13, 2013. Salazar disputed much of what the CDIU investigators reported. Accordingly, the ALJ subpoenaed one of the investigators to appear at a supplemental hearing on March 26, 2014. Salazar was represented by an attorney at both of these hearings. On June 18, 2014, the ALJ issued a decision again finding Salazar not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on March 9, 2015.

**DISABILITY ANALYSIS**

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ identified rheumatoid arthritis, obesity and asthma as Salazar's severe impairments. The ALJ found that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ concluded Salazar had the ability to perform sedentary work, except she could only occasionally stoop, crouch, crawl, kneel, and climb ramps and stairs and she should never climb ladders, ropes, or scaffolds. She should also avoid concentrated exposure to dust, fumes, and gases.

Based on this residual functional capacity ("RFC"), the ALJ concluded Salazar could perform other work in the national economy, such as telephone solicitor and telephone answering operator. Accordingly, the ALJ found Salazar not disabled under the Act.

## FACTS

Salazar was 42 years old on the date of her alleged disability onset. She has a high school degree and had worked for 18 years as a bus driver. I incorporate the previous court's thorough summary of Salazar's medical care from 1999 to 2009. *See Salazar*, 859 F. Supp. 2d at 1207-1214.

On May 4, 2009, NP Probst issued an opinion reflecting that Salazar's rheumatoid arthritis "makes it very difficult for her to use her small joints (hands) for any significant period

of time. Even sedentary work such as keyboarding or other activities grasping would be quite difficult." AR. 275. Two days later, x-rays of Salazar's hands revealed "good mineral content with intact relationships through the carpals, metacarpals, and phalanges. Metacarpophalangeal and interphalangeal joints are all well-preserved and there is no radiographic evidence to suggest either systemic or osteoarthritic abnormalities at this exam." Tr. 954.

Salazar then established care with John Constien, M.D., and reported at her May 2010 appointment with him that she felt tired and achy in her feet, ankles, knees, hips and back. Tr. 947-48. She hoped to start exercising in a pool with warm water. She used cannabis tea for her pain, preferring not to use oxycodone. Dr. Constien noted no areas of any inflammation of the soft tissues. He thought her fatigue was related to sub-optimal treatment of her sleep apnea.

Salazar told NP Probst in February 2011 that she was taking Enbrel for her rheumatoid arthritis; she described the medication as helpful although she had difficulties with her activities of daily living. Tr. 951. Her joints revealed no abnormalities, and she had some tenderness over her wrist and fingers. Tr. 952. He directed her to follow up in one year.

Salazar returned to Dr. Constien in March 2011 for cellulitis in her right toe; the doctor prescribed antibiotics.

Dr. Ellison reevaluated Salazar in May 2011. At that appointment, he noted Salazar drove herself to the appointment. She reported joint pain in her right food, right wrist, right shoulder and neck, with occasional symptoms in her hip and jaw. She felt stiff, with burning fingers, and occasional tenderness in her feet. She reported relying on her children "for just about everything . . . and says they may even have to feed her." Tr. 965. Her son helped her undress and helped her put on her socks. She could load the dishwasher, wipe off counters, and

supervise cooking. She could walk about a block, but not up or down stairs. She could drive short distances on good days. Sometimes she used a wheelchair. On examination, she related generalized tenderness, especially in the lumbar area, and reduced range of motion. She reported pain "on manipulation of most joints, tender some fingers joints, ankles, etc., not able to squat and rise, no arthritic stigmata." Tr. 967. Dr. Ellison could not evaluate Salazar's hip, knee, or ankle range of motion because of pain on manipulation, nor could he evaluate her straight leg raising. Her range of motion for her elbows, wrists, and fingers was normal. He assessed her with "polyarthralgia, diagnosis of rheumatoid arthritis still seems questionable to me," as well as severe chronic depression, severe obesity, mild type 2 diabetes, long-time thyroid supplement therapy, and mild asthmatic seasonal bronchitis. Tr. 967.

      The CDIU conducted an investigation of Salazar by interviewing her under the pretext of investigating an identity theft ring. When investigators initially appeared at her home, a teenage boy told them his mother had gone to visit a friend in the hospital who had just given birth. On a subsequent visit to Salazar's home, the investigators watched Salazar pick up a chair and walk 20 paces across her yard. After the group decided to move, she picked up the chair and walked another 20 paces. The detectives interviewed her for 50 minutes and observed her to be calm, alert, oriented, pleasant and appropriate. She showed no signs of fatigue or anxiety. She said she had recently seen co-workers at a yearly organized "camping trip," which Salazar later explained was a retreat to a beach house. Tr. 509. The detectives understood Salazar drove her minivan daily and that she took her sons to various school and sports activities. Salazar disputes that she made these statements. Salazar said she used the internet to shop online and for Facebook. She said she shopped at Safeway, Fred Meyer, and Wal-Mart, and that she participated in a water

aerobics class. The detectives observed her using her head, neck, shoulders, arms, and hands normally and watched her stand and walk normally. She had no trouble holding and manipulating plastic-covered sheets of paper, and she picked up the sheets that had fallen to the ground. She was babysitting a three-year-old boy. The report indicates that "video and photographs were taken and a CD was logged into evidence and placed in the safe at the Salem CDI Office." Tr. 510.

There are no treatment records after Salazar's February 2011 appointment with NP Probst until December 2013. The December chart record is obscured by a post-it note, but it appears the medication she was taking worked better than Enbrel. (Later chart notes reflect the new prescription was Humira.) It appears she complained of pain in her great toe and left heel, which made it difficult to walk. Upon examination, she displayed no joint deformities, but she had tenderness over both knees, ankles, her right great toe, and her left heel. She had no hand deformities, but she had mild swelling.

She saw Dr. Constien in January 2014. Her right knee was red and puffy and she had hit her right great toe, which was also red and puffy but getting better. She had no edema in her extremities, but she had a small right knee effusion with mild warmth compared to her left knee. She was prescribed Norco for additional knee pain, and was encouraged to lose weight.

A month later, she went to urgent care for painful swelling behind her right knee. A baker's cyst was observed via ultrasound. She was prescribed Oxycodone.

Three days later, on February 5, 2014, she returned to NP Probst. The swelling had decreased, but she still complained of pain. NP Probst noted no deformities in her joints, but identified a palpable baker's cyst. NP Probst injected her knee with an anti-inflammatory.

## DISCUSSION

My attempt to find pro bono counsel for Salazar was unsuccessful. Accordingly, I instructed Salazar that she need not provide any case, statute or other law in support of her statement of disability; instead, I directed her to explain why she believed the ALJ's decision was wrong. Salazar filed a lengthy opening brief (17 pages) and a lengthy reply (16 pages) generally explaining her work history (almost 18 years as a bus driver), how her symptoms developed over the course of years, and how she continued to work despite these symptoms. The medical records generally support this history.[1]

Salazar challenges the ALJ's findings in the following ways. She first disputes the findings of the investigators, and the ALJ's reliance on their report. This is relevant to the ALJ's determination that Salazar's statements regarding the intensity, persistence, and limiting effects of her symptoms are not entirely credible. Salazar disputes the persuasive nature of Dr. Ellison's reports. I consider Dr. Ellison's report in the context of the ALJ's evaluation of all the medical evidence. Salazar also questions whether the ALJ properly evaluated her brother's statement, and whether the ALJ followed the court's remand order.

---

[1] I do note some inconsistencies. For example, Salazar reported that in the summer of 2005 her knee pain was so intolerable that she could "barely move it." Pl.'s Mem. 4. At her appointment in August 2005, NP Probst noted that while Salazar's arthritis was symptomatic with chronic pain, stiffness and swelling, she was "not having the flares since on Arava." Tr. 235. On examination, she had mild swelling over her wrist and fingers, but her hips and knees had improved, with less pain on range of motion. Similarly, she reports that by the end of September 2005, she felt she was endangering school children because she could not press the brake with her foot. When she appeared for her appointment, she says her "specialist examined my knee and said it looked like I was suffering nerve damage, likely from my medication. He switched my medication[.]" Pl.'s Br. 5. To the contrary, NP Probst did not mention any nerve damage, and he "continue[d] the present medication regimen and lab testing every 8 weeks." Tr. 235.

I. Salazar's Credibility

Salazar testified in January 2009 that pain and stiffness prevented her from working. She testified that she could bathe and dress herself about 75% of the time and the rest of the time she stayed in her pajamas. She could cook, load the dishwasher, and drive a car. A couple of days a week she could not drive. She got her three children up for school (17, 13 and 9 years old at the time), loaded the dishwasher, and spent time on her computer or watching television. On good days, she could sew. She could sit for 45 minutes before moving around. She could stand for ten minutes on good days. Her children helped her with her socks and undergarments 60% of the time. On bad days, she lied in bed; she had ten bad days a month. Tr. 31-35.

At the second hearing, in November 2013, Salazar testified that her children were 25, 22, 18 and 14. She testified her condition was "basically the same." Tr. 434. She testified that her hands were swollen about 60% of the time, she had a hard time holding dishes, and that she dropped things. She thought the pain in her feet and back had worsened. She could walk about half a block. She could drive a couple of times a week. She disputed many of the things in the CDIU report. Tr. 434-439.

At the third hearing, one of the investigators testified about his interaction with Salazar. Salazar's attorney cross-examined him, and then asked questions of Salazar about her recollection of the interaction.

The ALJ found Salazar's testimony about the intensity, persistence and limiting effects of her symptoms not entirely credible. He mentioned the objective medical evidence, which indicated examination of her fingers and hands over the course of years revealed a strong grip, minimal swelling, and minimal treatment, in stark contrast to her reports of being unable to get

Page 11 - OPINION AND ORDER

out of bed and unable to feed herself at times. He additionally thought Salazar's daily activities were more involved than one would expect given her reported symptoms. She took care of her children, prepared meals, drove a car, did laundry, loaded the dishwasher, grocery shopped, and attended soccer games. The ALJ thought these activities were consistent with an ability to perform sedentary work. Finally, the ALJ pointed to Salazar's inconsistent and exaggerated statements, relying on her report to Dr. Ellison in 2011 and the CDIU report.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). Here, as the ALJ summarized (and as I indicate above), examination of Salazar's joints repeatedly indicated no deformity, only mild swelling, and the overall medical record is inconsistent with her reports of being unable to get out of bed and unable to feed herself some days.

Additionally, as the ALJ noted, Salazar's activities, corroborated by the CDIU investigative report, appear to be consistent with an ability to perform sedentary work. Salazar disputes much of what is in the report, but there is no dispute on the following items: she was not home when the officers first came as she was visiting a friend in the hospital; she moved a patio chair weighing approximately 8 pounds about 20 paces, and then another 20 paces; she went on a trip earlier that summer; she drove her minivan; she could pick papers up from a seated position and manipulate them without apparent difficulty; she was babysitting a three-year-old;[2] she did not appear tired or anxious during the 50 minute interview; and the officers came to her home on a day when she said her symptoms were "[p]robably a little bit worse than an average day." Tr. 411. The ALJ considered the CDIU report in the context of the statements Salazar had made to Dr. Ellison about needing her children to do just about everything for her, including feeding her at times. Additionally, the same month when Salazar reported disabling symptoms to Dr. Ellison, she had been able to go on a trip with her friends.

---

[2]Salazar contends she only babysat this child when another adult was around, but no other adult was observed with the child on the day of her interview.

As the Commissioner explains, the use of investigators to examine claimant reports is permitted by law and such investigators may use a pretext to "gain the confidence of their targets." *Shaw v. Winters*, 796 F.2d 1124, 1125 (9th Cir. 1986) ("Government agents are permitted to assume false identities"); 42 U.S.C. § 405(b)(1) (Commissioner may "conduct such investigations and other proceedings as the Commissioner may deem necessary or proper"). The ALJ may consider the investigators' findings in evaluating a claimant's credibility. *See Darmaryan v. Colvin*, No. 14-cv-03551(VEB), 2016 WL 1698252, at *8 (C.D. Cal. Apr. 27, 2016) (citing other cases). Further, in this context, Salazar had an opportunity to question the investigator and object to the admission of the report. *See Manor v. Astrue*, No. C10-5944-JLR, 2011 WL 3563687, at *5-6 (W.D. Wash. July 28, 2011) (plaintiff had opportunity to object to report and to request presence of investigators).

Salazar points to errors in the report that she argues undermine the persuasive nature of the report. For example, she does not have three sons (she has two) and even though the report reflects a video was taken and logged into evidence, no such video exists. Although no one asked the detective about the mistake he made as to the number of sons Salazar had, the information is not relevant to the ALJ's disability determination. As for the missing video, the detective explained he made an error in his report, mentioning that he and his partner used different equipment for different investigations and no video was taken of his interaction with Salazar. Tr. 392. The ALJ was entitled to accept his explanation. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."). As for Salazar's remaining disputes with the report, they are only alternative explanations for what the investigators

observed. The ALJ was permitted to find that the report offered factual support for his conclusion that Salazar was not nearly as limited as she purported to be. In sum, "[i]f the ALJ's finding is supported by substantial evidence, the court "may not engage in second-guessing." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).

The ALJ did not err.

II.     Lay Testimony

Salazar suggests the ALJ did not adequately consider her brother's statement. Her brother, James Thompson, submitted a letter dated June 6, 2010 in which he explained Salazar continued to drive a bus despite the decline in her health. He explained she could no longer perform those duties, and that he could not "conceive of any type of job that she could possibly perform at this point." Tr. 512.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). The ALJ noted that Thompson did not identify any specific functional limitations but, instead, opined generally that Salazar was disabled.

Thompson limited his discussion to Salazar's ability to perform her work as a school bus driver. He then more generally opined that he could not conceive of any jobs Salazar could perform; that opinion is not entitled to "any special significance" as it is an "opinion on issues reserved to the Commissioner"–*i.e.*, the question of Salazar's disability. 20 C.F.R. §§ 404.1527(d), 416.927(d) (in the context of medical opinion); 20 C.F.R. §§ 404.1529(c)(3),

416.929(c)(3) (consider lay witness statements about "symptom-related functional limitations and restrictions"). The ALJ gave germane reasons to give little weight to Thompson's statement.

III.   Medical Evidence

The ALJ summarized both Dr. Ellison's 2006 report and his supplemental 2011 report. The ALJ noted Dr. Ellison's 2006 report reflected that the doctor's findings were not consistent with the degree of pain reported by Salazar. Tr. 292. Similarly, Dr. Ellison's findings in 2011 were "inconsistent with allegations of disabling impairment." Tr. 293. Giving significant weight to the agency medical consultant opinions, the ALJ concluded limiting Salazar to sedentary work would account for her occasional swelling and reported tenderness. He noted these consultants had considered the CDIU report and the recent medical evidence. Tr. 297 (citing Tr. 538-39, 552). The ALJ explained why he continued to give little weight to NP Probst's opinions, finding the 2009 note about Salazar's inability to use her hands to be unsupported by the objective medical evidence, and citing the court's decision agreeing that the 2005 opinion was not entitled to any weight.

Salazar disagrees that Dr. Ellison's opinions are convincing, relying on extra-record evidence about a disciplinary proceeding and arguing he lacked expertise in treating rheumatoid arthritis. She also points to NP Probst's statements about her limitations and to her early diagnosis of rheumatoid arthritis as evidence of her inability to work.

I do not consider Salazar's new evidence related to a 1996 disciplinary proceeding and later reinstatement purportedly involving Dr. Ellison. The "new" evidence must be material to determining Salazar's disability and Salazar must show good cause for having failed to produce the evidence earlier. *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001). To be material,

Page 16 - OPINION AND ORDER

there must be a "reasonable possibility" that the new evidence would have changed the outcome of the administrative hearing. *Id.* A 15-year-old disciplinary proceeding and subsequent reinstatement is not material to Salazar's claim of disability. The ALJ properly considered and relied on evidence from a licensed physician. 20 C.F.R. §§ 404.1513(a)(1), 416.913(a)(1) (licensed physicians are acceptable medical sources). Further, there is no reason for Salazar's late submission of this information.

With respect to the ALJ's evaluation of the medical evidence, NP Probst is considered among the "other sources" listed in the Social Security regulations who are not acceptable medical sources. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d). The ALJ may reject the opinions of such sources by giving reasons that are "germane" to that source. *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010). The ALJ accurately reflected the court's findings as to NP Probst's 2005 opinion. Additionally, the ALJ found NP Probst's 2009 opinion to be inconsistent with the record. While NP Probst occasionally noted joint swelling, he did not do so consistently. Additionally, x-rays reflected no evidence of abnormalities in her hands. The ALJ also noted testimony from Salazar's son about Salazar's ability to use the computer for Facebook and to play games "every day." Tr. 418. Although Salazar now comments that she uses a tablet, the testimony given was about use of a computer. These are germane reasons to reject NP Probst's opinion.

Salazar is left, then, with a record reflecting a diagnosis of rheumatoid arthritis, which the ALJ accepted. However, a diagnosis alone is insufficient to establish functional limitations. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("A claimant bears the burden of proving that an impairment is disabling."). Thus, contrary to Salazar's contention, the fact that Dr.

Ellison is not a rheumatologist is irrelevant.[3]  In the end, the ALJ evaluated all of the medical evidence and concluded the lack of objective abnormalities, and her mild and only occasional swelling, indicated Salazar retained the ability to perform sedentary work despite her diagnosis of rheumatoid arthritis.  *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").  The ALJ did not err in his evaluation of the medical evidence.

IV.     Court's Remand Order

Salazar contends the ALJ ignored the court's remand order by relying on the CDIU report, and ignoring the medical evidence and the lay witness statements.

The ALJ specifically referenced the court's order in the following ways:  he accepted that Salazar's rheumatoid arthritis was a severe impairment (tr. 287); reevaluated Salazar's credibility in light of the investigation (tr. 296); reevaluated the objective medical evidence in light of Dr. Ellison's subsequent examination and Salazar's more recent medical records (*id.*); noted the court agreed NP Probst's October 2005 statement was not entitled to any weight (tr. 297); and evaluated NP Probst's May 2009 opinion but found it to be unsupported by the record.  Since the court reversed and remanded for "further proceedings consistent with this opinion," it did not preclude the ALJ from considering the new evidence in the form of Dr. Ellison's opinion and the CDIU report.  *Salazar*, 859 F. Supp. 2d at 1229; *see Stacy v. Colvin*, 825 F.3d 563, 567-68 (9th Cir. 2016) (on remand, ALJ may decide anything not foreclosed by the previous decision).  The ALJ did not err.

---

[3]His letterhead reflects that he is an internist.

Page 18 - OPINION AND ORDER

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this ____17th____ day of October, 2016.

                                                 /s/ Garr M. King
                                                 Garr M. King
                                                 United States District Judge